## HOLDANE vs. THE TRUSTEES OF THE VILLAGE OF COLD SPRING.

Where there has been an unequivocal dedication, by the owner of lands, to the public, for use as a highway, manifested by acts and declarations, and the road so dedicated is susceptible of public use or passage, so as to be made or become a highway, and it has been openly used in pursuance of the dedication, no formal act of acceptance by the public authorities is necessary, to give to the public a right to its unrestricted use, and that not as an easement or appurtenance to adjoining lands, or as a private right, but as a public right, requiring no interest in the neighboring property, or even business with its occupants, to justify its exercise. S. B. STRONG, J., dissented.

User by the public is a sufficient acceptance of the dedication.

But neither the intention to dedicate land to the public for the purposes of a street, nor the use thereof by the public in that manner, can make it a highway, or confer upon the public the rights of a highway in that which will not answer the settled definition of a highway.

Therefore, a *cul de sac*, or street which is closed at one end, and only communicates with a public road at the other, is not susceptible of dedication to public use as a highway.

It is essential to a public right, or a public use of a road, that it should be a *thoroughfare;* and that it should not be the means merely of access to the property of private persons, but the means of passage for the whole community from one public place to another. Without this, whatever private privileges may be created, no public rights arise.

Such a road could not be made a highway by laying it out as such, or other action, by the public authorities; neither can it become such by dedication.

APPEAL, by the defendants, from a judgment entered upon the report of a referee. The complaint alleged that the plaintiff had purchased from Frederick Philipse and others, who were the owners at the time of such purchase, and was entitled to, and was in the actual possession of, a certain piece of land situate in the village of Cold Spring, in the county of Putnam, bounded northwesterly by lands of George P. Morris; northeasterly by lands of the said Frederick Philipse and others; southeasterly and easterly, partly by lands of the said Frederick Philipse and others, and partly by Northern avenue, so called; and southwesterly by lands of the said Frederick Philipse and others, containing ten acres and a half, be the same more or less. And that said lands and premises were, by agreement of the plaintiff with the said George P. Morris and the said Fred-

erick Philipse and others, made subject to this provision and condition: that in case the plaintiff should subdivide and lease or sell the premises, in a specified number of smaller parcels or lots for building purposes, then so much of the above described premises as is included within the lines of Morris avenue, as heretofore surveyed and contemplated to be made a public street or highway by the said Frederick Philipse and others, the former owners thereof, but never yet actually dedicated or laid out as a public street or highway, being one chain wide, and about six chains and twenty-eight links long on the longest or easterly side thereof, and extending from the line of the lands of George P. Morris, southeasterly to the northwesterly line of Northern avenue, as laid out and opened, should be dedicated as a public street or highway, and thrown open for public travel, but not otherwise; and subject also to the right of way reserved and granted, or agreed so to be, to George P. Morris and his assigns, and to such other persons as shall be or become entitled thereto, through and over a part of said contemplated avenue. And the plaintiff further alleged that he had never subdivided and leased or sold the said premises in smaller parcels for building purposes, or any part thereof; and that said Morris avenue, as surveyed and contemplated as aforesaid, and included within the general boundaries of the piece of land above described, had not, nor had any part thereof, ever been used, opened or dedicated to the public as and for a public street or highway; and that until the same should be so dedicated, or should legally or in due form of law be made or become a public street, the plaintiff was entitled to a private right of way, in common with George P. Morris or his assigns, or such others as might be or become entitled thereto, in and over a strip of land of forty feet in width through the middle of said contemplated avenue, and extending from the land of George P. Morris to the northwesterly line of Northern avenue, and also to the sole use and occupation of so much of said contemplated avenue as was not comprehended within said strip of forty feet; and that he had the right and privilege of enclosing said contemplated avenue, subject only to the rights therein of

said George P. Morris and his assigns, and the other persons who may be or become entitled to such right of way. The plaintiff further stated that he made and erected fences on the said contemplated avenue, and granite gate-posts or columns along the northwesterly line of Northern avenue as now opened, for the purpose of enclosing the said contemplated avenue from the public highway or street, as he had and has a right to do; and that the said fences and gate-posts, or columns, were the same alleged obstructions mentioned and referred to in the notice and resolution hereinafter mentioned. That the free-holders and inhabitants of the village of Cold Spring were con-stituted a body corporate, by the name of "The Trustees of the Village of Cold Spring," passed April 22, 1846; and that the defendants, as said trustees of said village, now pretend and claim, that the said contemplated avenue is a public highway or street, and claim to exercise authority over and make regula-tions in relation to it as a pnblic street of the village of Cold Spring; and that on or about the first day of September, in the year 1853, the defendants caused to be served on the plaintiff a notice and copy of the resolution passed by them, referred to in said notice, of which the following are copies, to wit:

"JOHN H. HOLDANE, ESQ.

Sir: The following is a copy of a resolution passed by the board of trustees of the village of Cold Spring, on the thirtieth day of August, 1853:

Resolved, That John H. Holdane be notified to remove the obstructions he has placed on Morris avenue, such as stone columns, fences, &c. on or before the 7th day of September, 1853, or that the trustees of the village will cause the same to be removed.

You are therefore required to remove the obstructions ac-cordingly. August 31, 1853. By order of the board of trustees.

E. A. PELTON, Clerk."

And the plaintiff was informed and believed, that the defend-ants, in accordance with such resolution passed by them, intended to, and would, unless restrained by the court, tear down, destroy and remove the said fences and granite gate-posts or columns,

so erected by the plaintiff on said contemplated avenue. The plaintiff therefore prayed that the defendants might, by the order and judgment of this court, be restrained from tearing down, destroying or removing the said fences and gate-posts or columns so erected on said contemplated avenue, and from removing or interfering in any manner with any buildings, fences, walls, gates or other erections which now are or may hereafter be put upon said contemplated avenue by the plaintiff, or with the land; and also from exercising any authority or control whatever, over the said contemplated avenue as a public street or highway, until the same should be dedicated to the public, or otherwise become a public street or highway.

The defendants by their answer admitted that the plaintiff had purchased, or agreed to purchase the lot of land mentioned in the complaint, under the circumstances and in the manner hereinafter more particularly mentioned. But they denied that he was in the entire possession of the said lands; and, on the contrary thereof, alleged that the public pass over the said avenue without any molestation, or any attempt at hindrance; and they always have done so since the said street was opened, in or about the year 1850, as hereinafter mentioned. And they denied that said Morris avenue, as included within the general boundaries of the land mentioned in the complaint, had not been used or opened to the public, as and for a public street; and, on the contrary thereof, alleged that in or about the fall of the year 1850, the heirs and devisees of M. Gouverneur, deceased, who were then the owners of the land over which the same passed, opened Morris avenue from the northerly side of Main street, at a point opposite to Chestnut street, in said village, to within about sixteen feet of the land of George P. Morris, and fenced the same, on both sides thereof, the whole length of said avenue, and also worked or graded the same, and placed it in a condition for public travel; that, as so opened, worked and fenced, the avenue was sixty-six feet wide, or thereabouts, and was thrown entirely open the whole length thereof, from Main street to near the lands of George P. Morris, with the intention, as the defendants were informed by one of the said heirs,

Holdane *v.* Trustees of Cold Spring.

of making a perfect abandonment or dedication of it to the public, as and for the purposes of a public street; and that from the time it was so opened, it had been used as such, unconditionally and without any limitation or restraint, by the public. That in the spring of the year 1852, John Bevan made a map of the village of Cold Spring, and that, by direction of the said heirs, as the defendants were also informed by one of them, the streets in said village which were nominal and proposed, and which had not been opened for public use, were bordered by dotted lines, and the opened, permanent streets by smooth lines; and that by their direction, also, the following note or memorandum was put on the said map: "The streets and avenues, whenever designated by dotted lines, are only nominal and proposed, and may be altered or abandoned; and the lands upon which they are located are in no way to be affected thereby." And the defendants averred that Morris avenue was bordered on the said map by smooth lines the whole length thereof. That they were informed and believed, and therefore stated, that the plaintiff, well knowing the premises, and the facts and circumstances, as above mentioned, respecting the opening and dedication of Morris avenue, and being informed of the same by the heirs themselves, made a purchase of the heirs, of the lot of ground on which his house now stands, on the westerly side of Morris avenue, consisting of about four acres, and received a deed therefor from Frederick Philipse and others, the said heirs, which bounded the lot in terms on the easterly "by the side of Morris avenue." That subsequently, and sometime in or about the summer of 1852, the plaintiff agreed with the said heirs to purchase another lot of about five acres of land, on the easterly side of Morris avenue and directly opposite the lot last mentioned, for which no conveyance has been delivered; that after the purchase of this last piece the plaintiff applied to the said heirs to purchase Morris avenue, from the line of Northern avenue to the land of General Morris aforesaid, and was told by them, or by one of them, with whom he was transacting the business, that they could not sell it, for the reason that it had been permanently abandoned to the public for a

street; that the plaintiff nevertheless insisted upon buying what interest the said heirs had in the said street, which they finally agreed to sell him, but that no deed for this either, had ever been delivered. That at the plaintiff's solicitation an arrangement was at this time entered into between him and the said heirs, by which he was to give back his deed for the four acres first purchased, to the said heirs, and receive from them another deed, for the whole of his said purchase, including the said four acres, with a condition therein giving General Morris and his assigns a right of passage through the center of said avenue, for the purpose, as the defendants believed, of destroying all written evidence of the existence of Morris avenue through the said land, and of defrauding the public of their rights therein; but that this arrangement had not yet been perfected.

The defendants further alleged, that the plaintiff had obstructed this street as so opened and worked, as mentioned in his complaint in the cause, by placing four stone columns or posts across the same near Northern avenue, and setting his fences in and on the said avenue, from the said posts to the termination of the said street near the lands of Gen. Morris aforesaid, on both sides thereof, about thirteen feet each. That the avenue, since it was opened and worked by the heirs as above mentioned, had been worked and repaired by the defendants, who had always claimed authority over it for that purpose, and had never been interfered with in the exercise of it in any way, until the interference of the plaintiff, as mentioned in his complaint. The defendants, upon information and belief, denied that the plaintiff was entitled to the sole use and occupation of so much of the said avenue as was not included within a strip of forty feet through the middle of the same from the lands of Gen. Morris to Northern avenue, or that as against the public he had the right to close up the said avenue, subject only to the rights therein of Gen. Morris and his assigns, and the other persons who may be or become entitled to such right of way. They admitted that the plaintiff had made and erected fences on the said avenue, and also four granite columns across the

Holdane *v.* Trustees of Cold Spring.

same, on a line with the northerly side of Northern avenue, for the purpose of closing the said street from the public, and that the said fences and posts were the same obstructions referred to in the notice and resolution mentioned and set out in the complaint; but the defendants, on information and belief, denied that the plaintiff ever had, or now has, a right to erect the said fences or posts on the said avenue, as claimed in the complaint. The defendants admitted that the inhabitants of the village of Cold Spring were incorporated by the name of the Trustees of the village of Cold Spring, by the act, and at the time, mentioned in the complaint, and that the act of incorporation was duly adopted by the electors of the village ; and further, that the defendants, as such trustees, claim that the said avenue is a public street, and claim to exercise authority over it, and to make regulations in relation to it as a public street of the village of Cold Spring, and that they caused the notice and copy of resolution to be served on the plaintiff, at the time and of the purport mentioned in the said complaint. And they also admitted that in accordance with the resolution, they intended to remove the obstructions, as they were advised by counsel and believed they had a right to do. And they further alleged, that they were advised and believed and therefore stated on such information and belief, that the said avenue had been dedicated to the public as and for a public street.

The plaintiff put in a reply, denying most of the allegations in the answer. He admitted, however, that the deed for his first purchase bounded the same, in terms, on the easterly by the side of Morris avenue..

The cause was referred to *James Emott,* Esq. in October, 1854. He found and determined as follows: 1. That by or before January, 1853, and before the commencement of this action, the plaintiff had made an agreement for the purchase, from the heirs of Mary Gouverneur, of the lands described in the complaint, including the strip of land hereinafter mentioned and known as Morris avenue, so called; that he had paid a portion of the purchase money therefor, and taken possession thereof.

2. That such purchase by the plaintiff, of the strip of land which was fenced and opened as the prolongation of Morris avenue, from Northern avenue northwardly through said lands to the south line of George P. Morris, was expressly made subject to any rights which the public might have in or to the use of said land as a public street or highway.

3. That in the year 1850, the heirs of Mary Gouverneur, being then the owners of all the lands aforesaid, caused to be opened and fenced the said strip of land running through the lands sold by them to said plaintiff, and being the prolongation of Morris avenue, from its intersection with Northern avenue to the south boundary of lands of George P. Morris, which is also the north line of the village of Cold Spring, with the intention of dedicating the same to the use of the public as a highway, and that such strip of land was mapped and designated as a highway by the consent and direction of the said heirs of Mary Gouverneur, or their agent in charge of said property, upon the map of the village of Cold Spring made and published by John Bevan.

4. That said strip of land so opened and fenced, was used by the public from that time, by walking and driving upon the same, and by going up to the enclosure of George P. Morris, and returning over and by the same, until it was closed by the plaintiff.

5. That said road, so opened and fenced and used, led and extended from and out of a public road leading from Main street northwardly, and known as Morris avenue, at its intersection with a public road running east and west along the south line of the plaintiff's lands, and known as Northern avenue, to the south line of the lands of George P. Morris and the north line of the village of Cold Spring, and that said road terminates on the north at the enclosure of George P. Morris, without reaching any public highway or road.

6. That in July and August, 1853, the plaintiff erected stone gate posts upon and across the southerly end of said road or strip of land, where the continuation of said Morris avenue would enter his lands, and moved the fence along the same in and

upon said strip of land, thereby obstructing the same and impeding the public use thereof.

7. That the defendants thereupon, in the exercise of their authority over the streets and roads in said village, gave notice to the plaintiff to remove said obstructions by a certain day or they would cause the same to be taken down.

Upon these facts, the referee's conclusion and decision, was, that the said road or strip of land fenced and opened for a road, and which the plaintiff obstructed, was not a public highway; and that the plaintiff was entitled to a judgment restraining the defendants from tearing down or removing the gate posts, fences, or other erections of the plaintiff upon or along the same, with costs.

The following opinion was given by the referee, at the time of making the above decison:

" I think the evidence in this case established an unequivocal intention, on the part of the Gouverneur heirs, to dedicate as a street what is called Morris avenue, through the lands now owned by the plaintiff, to Gen. Morris' line, and terminating at his fence. In the first map of their property made by them, a street is laid down under this name, having the same general direction and character, though not absolutely identical with, the present northern extension of Morris avenue. In 1850 they fenced and opened a strip of land of the width of 66 feet, from Northern avenue to Geo. P. Morris' land, with the intention of making it a street; and if they did not work and grade it, the reason seems to have been, that the land was so smooth as not to make it necessary in their judgment to do so to make it a passable road. Upon the map of the village of Cold Spring, made by Mr. Bevan in the year of this extension, Morris avenue was indicated as an open street, with the assent and under the direction of the Gouverneurs. The public used it, as far as a street of such a character, not being a thoroughfare or passage from one highway to another, is susceptible of use. It is true, the dedication is recent and the period of user brief, but I apprehend that is not material upon a question of dedication, except

when the proof of dedication rests upon user alone, and the consent of the owner is to be made out wholly from the use by the public.

Whenever distinct and unequivocal acts of dedication by the owner are shown, no lapse of time can strengthen the proof of his intention to abandon the entire dominion which he has of his property, and bestow upon the public the right to its use. I think there is sufficient proof here, that this strip of land was fenced and thrown open to public use, as well as designated upon a map by the Gouverneur heirs, as a street, with the intention on their part of making it such, and so far I have no difficulty with the case.

It is claimed by the counsel for the plaintiff, that no dedication of a street to the public can be complete or effectual until it has been accepted, and that the acceptance must be made by the public authorities, the commissioners of highways, and can only be made by instituting the proceedings prescribed by the statute for the laying out, opening and recording public highways. This is Judge Harris' opinion in the case of *Clements* v. *West Troy*, (16 *Barb.* 251,) which was cited on the argument. I was unable at the time to reconcile the views taken in this opinion with my ideas of the doctrine of dedication, and even of the powers and duties of commissioners of highways, and was hesitating as to how far I should be bound by the authority of the decision. Since the argument, however, I have received the report of the trial of the same cause at the circuit, before Judge Wright, (10 *How. Pr. Rep.* 199,) where the doctrine of Judge Harris is expressly contradicted, and the case decided upon totally different principles. I think the views taken by Judge Wright, in his opinion, coincide with what has been the general opinion of the profession on questions of dedication. It seems to me that the commissioners of highways, or the defendants, acting as such, have no authority to perform such acts as Judge Harris supposed to be indispensable to effectuate a dedication of a road, unless there has been a user for 20 years, and then they will proceed on the ground of the user, and not of a dedication. In fact, the reasoning of Judge Harris would cut up

by the roots the dedication of streets or roads in the country. Besides, it is to be remembered, that the doctrine of dedication does not rest upon contract or the presumption of a grant, but is the creation of the courts to effectuate the intention of the party making the gift, and to subserve the public interest, when from the nature of the case, from the character of the right or interest to be created, or of the persons or party for whose benefit the gift or grant is intended, no grantee is in existence to take, or no grant could be made. (*See* 6 *Peters*, 431.) It seems therefore to be the doctrine of the cases, and to be sanctioned by the reason of the thing, that the use by the public of the highway intended to be dedicated, in the manner and to the extent contemplated by the dedication, furnishes the requisite evidence of acceptance of any dedication which is proved by acts on the part of the owner.

But a question still remains in this case, upon which I have had more difficulty, and on the decision of which I think the case turns. That is, the question whether a street or road can be dedicated as a public highway, which is closed at one end, and only communicates with a public road at the other; in short, what is known as a *cul de sac*. To show that this could be done, the learned counsel for the defendants cited to me two classes of cases. First, the cases which have upheld the dedication of lands or property for other purposes than roads, as a public square, a common, a burying ground, or a spring of water for public use. There no longer remains any doubt that such dedications can be made, and there is no doubt that such a strip of land as that included within the limits which bound what has been described as Morris avenue in this case, could have been dedicated for any of these purposes other than a road. It is not claimed, however, in this case, that any such dedication has been made. The claim, both in the pleadings and proofs, is of a dedication to be a public highway; and I am unable to see how the principle to which I have just adverted will help the defendants in this case. When a piece of ground is dedicated to the public for a square or burying ground, what they are to acquire, and what they are to use and accept. is not a right of passage upon

or over it, and the question of its susceptibility for use as a highway does not arise. But when a piece of ground is to be dedicated and accepted as a highway, what the public are to acquire and use, is a right for every person, not to have access to the property of any individual, but to pass and repass over a highway for the whole people. Whatever rights individuals might acquire under any circumstances by the opening and publishing such a street as this as a public highway, I think the public do not take any rights by such proceedings, unless such a street as this can be recognized as a legitimate public highway. I do not mean a highway under all the highway acts, so as to subject the town in respect to it to the duties and liabilities of the statutes respecting statutory highways. The doctrine of the Oswego case, in 2 *Selden*, 257, applies, as I understand it, to these duties and liabilities created by statute. But I mean a highway within the settled meaning and definition of a highway at common law. To prove that this street, closed at one end, leading up to the entrance or fence of Gen. Morris, and there terminating, and thus forming a *cul de sac*, could be such a highway, I was next referred to a class of cases in the English books, which, the counsel for the defendants claimed, recognized expressly such closes or streets as public highways. I have carefully examined all these cases, but I do not think they establish such a doctrine. In the case of the *Rugby Charity* v. *Merriwether*, reported in 11 *East*, 375, *note*, Lord Kenyon did indeed leave the question to the jury, whether the *locus in quo* was a common highway, with the remark that it made no difference that it was not a thoroughfare; but he puts it on the ground that in a great town like London, where there are so many closes of great antiquity, any other doctrine would be unsafe. Besides, this case, which was only a nisi prius case, has been disapproved on this very point. In *Woodyer* v. *Hadden*, (5 *Taunt*. 142,) the opinion of Lord Kenyon was questioned by Lord C. J. Mansfield, and again by Abbott, C. J., in *Wood* v. *Veal*, (3 *B. & Ad.* 454,) where that learned judge observed, "I have great difficulty in conceiving that there can be a public highway which is not a thoroughfare, because the public at large cannot well be in the

use of it." This latter case does not decide the point, but the doctrine of a highway in a close is doubted by all the judges. In *Jarvis* v. *Dean*, (3 *Bing*. 447,) the road in question was opened, at both ends, to public roads, and the question was left to the jury whether it had been used as a thoroughfare; and if so, they were authorized to presume a dedication. *Woodyer* v. *Hadden* decides nothing in favor of the principle contended for, and all the judges but one question the doctrine of the case of the *Rugby Charity*. In our own courts, I am aware of but one case containing any thing to sanction the doctrine of a highway in a *cul de sac*, and that is an *obiter dictum* of Hand, J., in *Wiggins* v. *Tallmadge*, (11 *Barb*. 457.) The case, however, was not decided on this ground, and even this dictum was disapproved by Cady, J., in a dissenting opinion.

The old definition of a highway is familiar to every one. It must be a road without termination—that is, leading from one public highway into another. Nothing but a thoroughfare will answer such a definition. Such a street as this will not. I think I am compelled to hold that such a street as this cannot be dedicated as a public highway; and upon this ground I place my decision in favor of the plaintiff. I have not examined the question as to the extent of the authority of the defendants under their charter, as commissioners of highways, because that is unnecessary in the view I have taken in this case."

*H. W. Warner* and *J. O. Dykman*, for the appellants.

*W. C. Hasbrouck*, for the respondent.

EMOTT, J. This cause was tried before me as a referee, and the judgment from which the defendants appeal was entered by my direction. I have bestowed upon the argument made by the learned counsel for the appellants, and upon the authorities which he has adduced, careful examination and reflection, without being able to come to any different conclusions from those which I reached when the cause was tried. Perhaps I shall not be able to add any thing to the reasons which I then assigned

for the judgment, and I do not purpose to enter upon any further discussion of the authorities.. But since, while the court now are all agreed that this judgment should be affirmed, we differ, and perhaps materially, in our views of the questions involved in the cause, I will state as briefly as possible the grounds on which I think our decision should rest.

There were two questions of fact in the cause: first, whether the Gouverneur heirs had done any thing, and what, to dedicate the strip of land in controversy to any public use; second, whether the public had done any thing, and what, to indicate their acceptance of the dedication. I had supposed that both these issues were disposed of at the trial, and the facts found clearly and explicitly, so that the case might be decided upon its legal principles. So the counsel for both parties evidently thought, and therefore nothing but the conclusions of the referee are included in the case, and none of the evidence is put in by either party. I do not see how we can go behind those conclusions, or dispose of the present appeal except upon the basis of the facts found in the court below, and assuming these to be the facts of the case. Now these facts are, as to the dedication by the Gouverneurs, in the first place, that this strip of land was marked and mapped by their consent and direction as a public street by the name of Morris avenue, upon a map of the village of Cold Spring, made by one Bevan in 1850. There was no pretense that this map was made by or for the defendants or any public officers. That is no part of the case. Whether it was made by Bevan on his own account, or in the employment and by the direction of the Gouverneur family, is quite immaterial. As to this street it was their map; because this piece of ground was marked out and designated upon it as "Morris avenue" by their direction; and that was as much their act as if Bevan had been solely employed by them or had made a map of their property only. There was another map of the village, earlier than Bevan's, which is mentioned in the pleadings and was introduced at the trial. What effect this might have had, or indeed what effect it ought to have had upon the questions in controversy here, it is impossible for us to determine, and cer-

tainly it is unnecessary to discuss. The point is not made or presented by any exceptions or otherwise. Besides, the subsequent acts and declarations of the owner of this land, if they are unequivocal and sufficient, must be decisive. If the first map published did not afford evidence of an unqualified design to ·dedicate this street, yet if that deficiency was supplied when Bevan's map was put forth, then the case is so far complete, and the tenor and effect of the first publication is immaterial. Especially is this so when this latter map is considered in connection with the contemporaneous action of the Gouverneurs, which I am next to mention.

For in the next place, at or about the date of this map made by Bevan, the Gouverneurs fenced this strip of land as a street and threw it open to public use, and so it remained until the plaintiff shut it up, in 1853. I think now, as I thought at the trial, that the evidence in the case clearly established that this strip of land was fenced and thrown open to public use, as well as designated upon a map as a public street, by these owners, with the intention of abandoning their entire dominion over it, and of bestowing upon the public the right to its use as a highway. Whether I was right then or now in this conclusion is not, I apprehend, a question, on the present appeal; because the act, and the intent which is a part of it, are acts expressly found as facts, and there are not only no exceptions to these conclusions, but none of the evidence before us from which to ascertain whether they are correct. Besides, I do not choose to rest my judgment upon a presumption drawn from principles of law purely, and in direct contradiction, not only to the facts found by the court below, but to what was manifestly the real intention of the parties. I do not choose to decide this case upon a presumed design not to make this a public street or highway, to be forced as it were upon the Gouverneurs and their acts by legal rules or inferences resulting from the situation of the lands. The fact is, I think, unquestionable, that they not only had, but manifested in the most explicit manner, the intention to open and dedicate this as a public street. I prefer to admit this, and to hold that their attempt was ineffectual, in conse-

quence of the situation and character of the road which they at-
tempted to dedicate, and from the effect of what I consider to be
well settled rules of law applicable to such a case. Then if I
was in error as to these legal rules and principles, that error can
be corrected, and the original intention of the owner of these
lands effectuated, or the cause retried by different rules. And
it strikes me that to say that the Gouverneurs must be presumed
not to have intended to dedicate a public street or highway be-
cause this piece of land which they opened, fenced and declared
to be such, was not a thoroughfare, is only saying indirectly what
was expressly and directly enunciated in the judgment below,
that such a street is not susceptible of dedication to public use
as a highway. The intention of the owners of these lands is a
fact, and it is proved and determined as such in the case before
us, as well as the manner in which it was manifested and de-
clared. Whether that intention, any more than a public user
of a road, can make that a highway or confer upon the public
the rights of a highway in that which will not answer the settled
definition of a highway, is the real question which I think ought
to be decided in this case.

Nor is there any more doubt as to the facts of the case bear-
ing upon the second issue—the acceptance of this dedication or
attempted dedication. It was found, and decided by the refe-
ree, that this strip of land "was used *by the public,* by walking
and driving upon the same, and by going up to the enclosure of
George P. Morris and returning over the same until it was
closed by the plaintiff." This user was by the public, by any
body and every body. It was not, as has been suggested, by
the occupants of adjoining lands, for there were none until the
plaintiff built, and then shut up the road. It is said the answer
and reply show that the road did not in fact run to George P.
Morris's land, because the one alleges and the other admits that
it stopped at a point sixteen feet from his line. As the evi-
dence is not in the case I am unable to say which is correct, the
answer or the report. If the question had been considered of
any consequence it would have been pointed out at the trial,
and now, I take it, we must assume the referee's report to be

true.   But it certainly is entirely immaterial whether this road stopped at the line of George P. Morris or sixteen feet south of it, or in the lands of the plaintiff, or of the Gouverneurs, or of any body else, so that it stopped short of reaching and running into another highway.   That is all that is material, and that is beyond dispute.

And it is equally beyond dispute that there have been no formal acts of the public authorities, no laying out or recording by the commissioners of highways or the defendants acting as such, if any such acts are necessary to complete a dedication. The acceptance is made out here, if it is made out at all, by user on the part of the public.   Upon this part of the case my conviction is clear and decided, that when there has been an unequivocal dedication by the owner of lands to the public, for use as a highway, manifested by acts and declarations, and the road so dedicated is susceptible of public use or passage, so as to be made or become a highway, and has been openly used in pursuance of the dedication, no formal act of acceptance by the public authorities is necessary to give to the public—to every person in the community—a right to its unrestricted use, and that not as an easement or appurtenance to adjoining lands, or as a private right, but as a public right, requiring no interest in the neighboring property, or even business with its occupants, to justify its exercise.   The very able opinion of Mr. Justice Wright in the case of *Clements* v. *West Troy*, (10 *How. Pr. R.* 199,) is entirely satisfactory to my mind upon this question, and I can add nothing to his reasoning.   I will only observe that it is not the question now, any more than it was in that case, whether commissioners of highways can be compelled to maintain and repair a road which has become public only by the dedication of the owner, accepted by open and common use.   There is a distinction between a free and public right of passage or way over lands, and a statutory highway, which the public authorities are bound to support.   I understand such a distinction to be recognized in the Oswego case, (2 *Selden*, 257,) which was cited in the court below, and that the public officers are not bound to assume the burden because

the public enjoy the benefit.  At all events, here is no at-
tempt to force such a burden upon these officers; they come in
voluntarily and attempt to protect the right of the public to the
use of what they claim has become a public highway by dedi-
cation.  It might perhaps admit of some doubt, whether the
defendants are clothed with right and authority to interpose to
enforce the rights of the public in a road not strictly within the
jurisdiction of commissioners of highways.  But that is a ques-
tion not, I think, now before us, and upon which I do not in-
tend to pass.

I think the difficulty in the way of the defendants in this
case is, that the road in question could not be made a high-
way, so that the public could acquire a right of free and indis-
criminate passage, such as they could assert, or the defendants
protect.  It is, I suppose, settled that such a road could not be
made a highway by laying out or other action of the public
authorities.  So it has certainly been held in this district.  I
cannot see how that which cannot be made a highway by the
legal action of the public authorities, under the statutes, can
become such by dedication.  And it must be remembered that
the right asserted by the defendants was a public right ; the
dedication which they claimed was of a highway, and no other
right of a different character, or of a less extent, could be in-
voked in this action, if any such exist.  Whether the acts of
the Gouverneurs were such as to give to any individual a right
of passage over this land, or to have this so called avenue
kept open and unobstructed, are questions which we are not
now called to determine, and upon which our present decision
will have no effect.  The observation of an eminent English
judge, to the effect that these closed passages or streets should
not be allowed to become traps to catch trespassers, has un-
doubtedly great force, in its proper application.  But that re-
mark was made in reference to private rights alone, and where
these only were in question.  It is not necessary in order to
protect individuals in any proper use of ingress and egress to
lands or property adjoining such places, that the means of such
access should be declared or become a public highway.  On the

other hand, the danger is that by such an application of the doctrine of dedication as is here contended for, such places, or "courts," as they are sometimes called in cities, may become traps for their owners or purchasers. There are estates in the city of New York, or perhaps the union of lots of two or three owners, fronting on and opening into great thoroughfares, extending back for a very considerable distance, built up around three sides of an open court or square thus formed, leaving the fronts open to the street for the convenience of the tenants of the various offices and apartments in the buildings. Are we prepared to decide that the acts of the owners of such property have made these lots a part of the public street, dedicated them as a highway and forfeited the right to their occupation or control? Why not, however, if such a *cul de sac* as this can become a public highway by opening and common use? The persons traversing such a court or place in a great city are a thousand-fold more numerous, more constant and diversified than will ever enter the street in question. Here the opening is as free and unqualified without obstruction to a public thoroughfare, and it is designated by a name indicating the express purpose of common user. Where does the analogy fail, unless in the want of marking and naming as an "avenue" on a published map, which we have in the case at bar? But I think we should hesitate to hold, in any such case, that any designation by the name of a court or public place, any opening to public or private convenience, any use of such a court by all who might be attracted by business or curiosity to the buildings or apartments to which it gave access, would deprive the owner of the land of the right, upon extinguishing all private rights of passage and all estates to which any such right might be appurtenant, to resume his dominion of his property, to close up entirely the court or square, or to erect upon it any building which he saw fit. And if so there, why not here? The true ground upon which these cases are to be put is, that in them all is wanting one thing that is essential to a public right or a public use of a road or way, and that is, that it should be a thoroughfare; that it should not be the means merely of access to the property of

private persons, but the means of passage for the whole community from one public place to another. Without this, whatever private privileges may be created, no public rights arise.

I do not purpose to enter into any detailed examination of the additional authorities furnished to the court, on this appeal, by the assiduity of the learned counsel for the appellants, and not adverted to in the opinion in the court below. It is enough to say that I do not discover in any of them, after an attentive examination, any assertion or decision that a road which is not a thoroughfare can be, or be made a highway.

For the reasons which I have thus rapidly given, I am satisfied that the decision was right. In the views which I have expressed the presiding justice concurs, and we are all agreed that the judgment should be affirmed.

Brown, P. J., concurred.

S. B. Strong, J. The referee finds that the former owner of the strip of land now claimed by the defendants as a public highway, caused it to be opened and fenced with the intention of dedicating the same to the use of the public as a highway, and that the same was mapped and designated as a highway, by their consent and direction, upon the map of the village of Cold Spring, made by one Bevan. But whether the surveyor was employed by such owners or by the public authorities of the village, is not stated by the referee. The plaintiff alleges, in his reply, that the map was made by Bevan on his own private account. The evidence before the referee is not reported, and we have nothing definite to show whether the surveyor acted in a public, or in his private, capacity. We cannot, therefore, assume that his conduct evinced any determination on the part of the public, to accept the proposed dedication, if indeed any was designed.

Clearly, an intent to dedicate land to the public use is insufficient, of itself, to constitute a valid dedication. It must be accompanied by acts which designate and open the land for the public use. A mere designation in a private conveyance, is

not enough to constitute a dedication, at least in rural districts. (*Badeau* v. *Mead,* 14 *Barb.* 328.) Why it should be considered as having that effect in cities, I could never understand. A private conveyance will undoubtedly confer rights upon the parties, but not upon strangers, (and as to that the public are strangers,) except by way of remainder. It may evince an intention, but that is all, so far as the public is concerned. Throwing the land open by fencing it on each side, and not enclosing it by gates, would, unexplained, go far towards establishing a dedication. But even those circumstances might not be conclusive ; and it seems to me that they were not, in this case. The supposed avenue did not extend entirely through the land of the owners. It stopped some 16 feet before reaching the land of General Morris. It did not cover, or extend to any public highway or street. It did not touch the land of any other person. The inference from this would seem to be that the proposed avenue was designed for the use of those only who should purchase lots bordering upon it. This inference would seem to be supported by a memorandum upon a lithographed map of the village, made previous to the spring of 1852. That states that the lands designated thereon for streets, avenues, public squares and other public purposes, are owned by the proprietors as private property, with the right of changing or discontinuing such streets, &c. But when a lot is sold fronting on any street not opened, the *purchaser* will be entitled to a right of way over the same from said lot to the nearest public highway ; the right of sale being in all cases retained when not specially conveyed. This map anteceded Bevan's, and is at least as reliable, to show the intent of the land owners. It was competent for them to throw their lands open for private or public use, and if that was done purely for private use, it would not create a public right.

But a proposed dedication is not, is my opinion, valid unless it is accepted by the public. There are many serious responsibilities upon the public officers having the charge of public highways, and when they are in cities or chartered villages, upon the corporation, which cannot, and should not, be devolved

upon them solely by individual action.   It would be an anomaly if private individuals could, by their own act, create a public right, and thus coerce a public duty.   There must be something more—sufficient at least to indicate the assent of the public. Such assent would be clearly manifested by the exercise of a control over the dedicated property by the officers selected and entrusted by the people to manage and superintend congenial subjects.   So, too, it would be indicated by common user under circumstances, and in a manner, evincing a claim of right, as distinguished from a mere license.   But the circumstances should be strong to show that what is done is under title, and not by permission, in order that what has been allowed from kindness should not be converted into a thankless and irrelievable burthen.   The referee finds that the strip of land in question was used by the public from the time it was opened and fenced, by walking and driving upon the same, and going up to the inclosure of George P. Morris, and returning over and by the same, until it was closed by the plaintiff.   He does not explain, and it is difficult to conceive, how it could be used up to the land of George P. Morris, when it is admitted in the defendants' answer that it did not reach that land by a distance of sixteen feet.   And as to any other usage, it may have been, and probably was, by the owners of the adjoining lots, who claimed under those who are alleged to have opened the avenue.   There is no pretense that any public officer entrusted with the management of the public highways in the village, ever interfered in the matter.   I conceive, therefore, that if any dedication was designed by the owners of the land, there is not sufficient to show that it was accepted, by or in behalf of the public, and that it was therefore incomplete, and it was competent for the owners to resume the entire property.

Without expressing any opinion upon the other question involved, I think that the judgment should be affirmed.

Judgment affirmed.

[KINGS GENERAL TERM, October 14, 1856.   *Brown, S. B. Strong* and *Emott,* Justices.]