## The People v. Charles Jackson.

To make the obstruction of a way an indictable offense, it must injuriously affect some right in which the public in their aggregate capacity have a common interest, as distinguished from a mere individual or private right. If it affect only the rights of an individual, or of a definite number of persons, less than the whole, in their individual capacity, no indictment lies.

To constitute a highway, the way must be one over which all the people of the state have a common and an equal right to travel; or, at least, a general interest to keep unobstructed.

When the obstruction of a way can prejudice only the rights of the owners or occupants of adjoining lots, they have their remedy by private action; if it affect only the rights of the inhabitants of the city, or the rights of the city in its corporate capacity, it may be a proper subject for the local police of the city to be regulated by ordinances and by laws; but in neither case would it be the proper subject of an indictment.

An alley or *cul de sac*, fifty feet in length, in the interior of a city block, opening into other alleys which extend to public streets, but having itself no communication with streets except through those alleys; not being capable of forming a passage way from one street to another, but furnishing access only to the rear of lots in the block; and never opened, worked, or used as a highway; and not shown to have dwellings upon, or adjoining it, to which it gives access, is not a way for the obstruction of which an indictment will lie.

*Heard November 2d. Decided November 30th.*

On exceptions from the Recorder's Court of the city of Detroit.

The defendant was convicted in the Recorder's Court, on an information charging him with obstructing a public alley in Detroit. From the testimony and plats produced on the trial, ·it appeared that there was an alley twenty feet in width, in section eight of the Governor and Judges' plan of said city, extending from State street to the centre of said section, and from thence at right angles to Rowland street, and that the *locus* of the alleged obstruction was an opening from the angle of this alley, twenty feet wide, in the rear of lot two of said section, extending fifty feet in the direction of Michigan Avenue, but not to it, and consequently only affording means of access, by

THE PEOPLE v. JACKSON.

means of the first mentioned alley, to the rear of one and two lots in said section.*

The following is the material evidence given in the case.

*The diagrams below will show the situation of the alley as claimed by the respective parties.

1. Section Eight, as claimed by the prosecution:

State Street.

Michigan Avenue.

2. Section Eight, as claimed by the defendant:

State Street.

Michigan Avenue.

(North ☞)

All questions of admissibility, and all the offers of excluded evidence, are omitted.

*Francis W. Hughes*, testified that he was clerk of the city of Detroit, and of the Land Board of said city; that the plan produced by him was found in the office when he came into it, and he now had the custody of it as Clerk of the Land Board.

The attorneys for the People then offered said plan in evidence, which purported to be the original plan signed by Governor Hull, and P. Audrain, Secretary, of section eight, of the city of Detroit, as laid out by the Governor and Judges, April 27th, 1807.

It is deemed unnecessary to give any further statement of the contents of this plat than appears in the opinion. It shows the alley as claimed by the prosecution, and as shown by the first diagram in the preceding note.

The witness testified further that he found a book in his custody as clerk of said Land Board, purporting to be Journal No. 1 of the Governor and Judges, in which he found an entry of date April 27th, 1807, which entry was read in evidence as follows:

"*Resolved unanimously*, That the plan of the sections numbered, 1, 2, 3, 4, 6, and 8 be confirmed, and be a record: that they be signed by the President of the Board, and attested by the Secretary in identification; and that no alteration be suffered therein, without an order of the Governor and Judges to that effect."

The counsel for the People then gave in evidence the proceedings of the city Common Council, showing that John Blindbury, on June 5th, 1855, petitioned to have the alley opened in the rear of lots 1 and 2, of sec. 8, which petition was referred to the Committee on Streets, and the Committee reported on June 13th, 1855, recommending that the obstructions in the alley be removed.

The counsel then read such a report in evidence, which was to the effect that the alley in question was obstructed

by fences and barns, and directed the marshal to remove them.

The counsel for the People further gave in evidence from the records of Wayne county a plan of sec. 8, of the city of Detroit, as there recorded on the 23d of December, 1848, in pursuance, as claimed, of the act of the territorial legislature of 1834, authorizing the Common Council of Detroit to have all the records of the Land Board transcribed and deposited in the registry of the city of Detroit.

They also then gave in evidence a deed from the Governor and Judges to Thomas Palmer, dated September 8th, 1831, of lot number 2 of said section, describing said lot as lot 2 according to said plan, without giving its metes and bounds. Also a deed from Thomas Palmer to Francis L'Etornour, dated March 13th, 1832, of the same lot, with the same description. Also a deed from L'Etornour to James Williams, dated April 28th, 1854, of the same lot, but describing it as fifty feet by eighty, and bounded on the east by public alley. Also a deed of the same lot from James Williams to Charles Jackson, describing it as fifty feet by eighty, and bounded on the east by public alley.

*William Champ* testified that he was acquainted with the *locus in quo* from 1836 to 1850, during which time he and his father lived on lot number 1 of said section 8. The whole section was a public common down to 1836, with occasionally a house or yard fenced in. Lot 1 had a building on it. In 1848, Mr. L'Etornour built a shop on lot 2, on what is now claimed as an alley. He first asked permission of witness to put it there, and agreed to remove it when witness wanted to use the alley. He put his shop within three or four feet of the west line of lot 54, and the east line of the alley, filling up the alley to within said three or four feet. Lots 1, 2, 3, and 54 were fenced as early as 1840. In 1838, there were only two buildings on the whole square. There were posts on the lines of the alley, across the corners of lots 3 and 54, which appeared as though it had been

fenced. It was not fenced in 1838 and 1840. Witness does not know that the adjacent corners of lots 3 and 54 had been fenced on the lines of the alley. Before L'Etornour put up his shop in the alley, lot 2 had been fenced in up to within three or four feet of lot 54, and he set his shop on the line of the fence. There was no fence on the west line of lot 54, north of lot 1. There was nothing about there, prior to 1838, to indicate an alley. In that block, lots 4, 3, 55, 53, and 54, were unenclosed. There was no use of the alley, as such, from lot 1 out to State or Rowland streets. There has been no use of the *locus in quo* as an alley since L'Etornour's shop was put on it, and the same ground was enclosed by his fence before that time. Witness used lot 54, and not the alleged alley, to accommodate his back premises. Lots 3 and 54 are fenced so as to touch each other. They have been thus enclosed since Mr. Jackson bought lot number 2 in 1854. Prior to that time, the corners where lots 3 and 54 touch each other, were not fenced across. Persons could go to L'Etornour's shop from lot 54, or from northerly. Jackson occupied lot 54 as a stone and lumber-yard. Lot 3 has been occupied to the corner of lots 2 and 54 since Jackson bought lot 2. There was never anything to indicate that the south-east corner of lot 3 was cut off in any way. That corner was enclosed as early as 1842. This alley was never marked, worked, or used as an alley, and it could not be while L'Etornour's shop was there. There was always two or three feet open of what was called an alley, and not fenced till Jackson fenced it. While witness occupied the premises he applied to the Common Council for leave to put a drain in the alley, and put it in by their leave.

*Francis L'Etornour*, testified that he formerly occupied lot number 2. He took possession of it in 1831 or 1832; put a building on it in 1832; moved his family on in 1842, and stayed till 1854. In 1831, the land about there was all a common. Witness owned lot number 2, fifty feet by eighty,

and occupied the twenty feet in rear of lot 2, but did not assume to own it. Witness asked Champ, in 1848, if he was willing witness should put a shop there. The shop was 18 feet by 32, and that and the woodshed covered 18 feet by 50 of the alley. The shop stood on blocks. Thomas Palmer never said anything about the alley, but witness told James Williams that the shop was in the alley.

When witness took possession the ground was all a common. He was the first occupant of the block, and occupied the whole of lot 2, alley and all, to within two feet of lot 54. There was then no use of it as a street or alley. Witness fenced in the alleged alley in 1831 or 1832. There was no particular reason for leaving two feet of it unenclosed. From 1831 till now, it has all, except two feet adjoining lot 54, remained in occupancy as private property. Witness went across the northwest corner of lot 54 to get out that way, first asking permission of Jackson so to do. He claimed that corner to a square as his private property. There was no fence on the west line of lot 54, north of lot 1, and lot 3 was fenced out square to lot 54 as early as 1834 or 1835, without paying any attention to any alley.

*Nicholas Thelan* testified that he was City Surveyor. He produced Hathan's Map of the city, so called, and it was given in evidence, in connection with the deeds of L'Etornour and Williams, which refer to it. The witness stated that, according to this map, lot 2 is fifty by eighty feet. There is in fact no alley there now; it is stopped up. The alley is laid down on this map as claimed by the people.

*John Blindbury* testified that he had known the premises for nine years. He occupies lot 1. When he first came there a shop was in the alley, and a small strip of the alley and a part of lot 54 were used to pass on. Witness' men drove teams through there by the shop. He came there in 1850; and in 1855 the shop was moved by Jackson on to the north end of lot 54. The space then remained open for about from four to six weeks.

THE PEOPLE *v.* JACKSON.

At one time there was a hole under where the shop had been, with water in it, and the deputy marshal notified him to fill it up. He refused because it was on the rear of Jackson's lot. A day or two after he was notified again, and then filled it up. About that time Jackson fenced up the alley. He put a fence across about six feet from lot 1, and another on the west line of lot 54. From four to six weeks, when Jackson moved the shop, there was nothing to prevent teams passing through the alley. Witness don't know that at any one time a team could have been driven through that alley without obstruction; don't know that a team was ever driven through there. The strip of the alley not enclosed was open in a common with lot 54. It was the general runway over lot 54 from Michigan Avenue to State street. The east part of lot 1 and the west part of lot 54 were used just as much as the strip of the alley.

The People then rested, and the defendant offered and read in evidence, a deed of lot 54 of said section 8, from the Governor and Judges to Ann Dyson, which deed bore date March 7th, 1809, and described the said lot 54, by metes and bounds, as sixty feet by one hundred, containing six thousand square·feet, and made no deduction for the alley in question, and made no reference to it.

It was admitted that the defendant married Ann Dyson in 1827, and had issue by the marriage, and Mrs. Jackson is now dead.

The defendant also read in evidence a deed dated March 7th, 1809, from the Governor and Judges to Mary Desnoyers, of lot number 3 in said section, adjoining lot 2, which latter deed also described said lot 3 by metes and bounds, as being sixty feet wide by one hundred feet long, containing 6000 square feet, and made no deduction for the alley in question, and contained no reference to it.

The defendant then introduced what purported to be Journal No. 2 of the Governor and Judges, showing that

the said deeds to Ann Dyson and Mary Desnoyers were ordered and issued by the Governor and Judges.

*John Farrer* testified that he had lived in Detroit over forty years, and that the block in question of section 8 was an open common down as late as 1830 or 1835, with no fences or buildings, and no streets or alleys, so far as was shown by the ground itself. The prosecution thereupon admitted that the plat of 1807 was not recorded in the office of the Register of Deeds till 1848.

*Mr. Hughes* was then re-called by the prosecution, and produced the journal of the Common Council of Detroit, of December 2d, 1835, by which it appeared that on that day said Council resolved as follows: "That the clerk be directed to take the necessary steps to cause the adopted plan of the city of Detroit, signed by the Governor and Judges in 1807, to be recorded in the County and City Register's offices."

The prosecution again rested; and after the cause had been argued, the People, by their counsel, requested the Court to charge the jury,—

1st. That the adoption of the Plan of Detroit, by the Governor and Judges, was final and absolute, as to lands in common, vacant or public lands, and as to all lands except those covered by private claims or occupation, or public reservations, prior to the time of such adoption; and did of itself make the alleys and streets laid down on the plan public alleys and streets, in all cases where there was no private claim, reserve, or occupation existing upon the spaces so laid down in streets and alleys, at the time of said adoption; and as to such alleys and streets, no evidence of user according to the plan is necessary.

The Court charged accordingly; and the defendant excepted.

2d. That said plan was capable of alteration by the Governor and Judges, but only by order of the Board, in the same formal mode by which it was adopted.

The Court so charged the jury; and the defendant excepted.

The Court further charged, that after the Governor and Judges had once adopted said plan, they had no right to make any change in it, except where it interfered with private property or reservations at the time it was made:—

That the *locus in quo* being a public common when the plan was made, no act of user was necessary to make it a public alley:—

That any action of the Governor and Judges, after the plan was adopted, by which they recognized it as such, was a sufficient acceptance in law of the *locus in quo*, on behalf of the public, to make the same a public alley.

To all which charges the defendant excepted.

Thereupon the defendant asked the court to charge the jury, among other things:

That the making of the paper plat of Detroit by the Governor and Judges, in 1807, had not the effect, of itself alone, to make an alley of the *locus in quo:*

That the act of the Governor and Judges of 1807, by which the plat of the city was made on paper, was revocable by the Governor and Judges at any time before there was an actual acceptance of the alley in question, as such, by the public:

That the granting of the two deeds, in 1809, one of lot 54 to Ann Dyson, and one of lot 3 to Mary Desnoyers, those two lots touching each other, and closing the alleged alley, and there being no evidence of any acceptance of the alley as such by the public prior to that time, was a revocation of the act of dedication *pro tanto*, and a discontinnance of the *locus in quo* as a public highway or alley, so far as it was identical with those lots, and also of all that part of it in rear of lot 2.

That if the jury are satisfied from the evidence there was no public user of the *locus in quo* as an alley, or

any act of the public accepting the same as such, prior to the deeds to Mrs. Dyson and Mrs. Desnoyers, and prior to the occupancy of the rear of lot 2 by L'Etornour, then private rights had intervened in the *locus in quo*, which could not be displaced or affected by any act of the public disregarding those rights.

If the jury are satisfied from the evidence that the *locus in quo*, and the adjacent property, was an open common, without marks to designate the lines of lots, streets, or alleys, from 1807 till 1830, more than twenty years, that fact of itself is sufficient to negative the alleged fact of the existence of an alley there, and they should find for the defendant.

If the jury are satisfied from the evidence, that Jackson, and those under whom he claims, have been in the peaceable possession of the *locus in quo*, claiming title thereto, more than twenty years before the information was filed, they must find for defendant.

The court refused these requests, and the defendant excepted.

The jury under the charges as given found the defendant guilty as charged in the information.

The questions involved in the case being deemed important, and there being other cases pending in which the same points arose, many of the rulings of the Recorder were *pro forma*, for the purpose of procuring the opinion of this court thereon.

The questions contested in the court below were questions relating to the journal of the Governor and Judges, the validity of their plan of the city, and its effect on making the *locus* a public alley, the question of dedication, acceptance and abandonment, and various questions of evidence. Whether the obstruction of such an alley or *cul de sac* could be the subject of indictment was not discussed, but in this court an argument upon that point was specially directed, and as that only was passed upon by the court, the

7 MICH.—2 D.

authorities cited by counsel to other questions are omitted.

*A. Russell* for the People:

1. We understand the question to be this: Is the alley exhibited in the evidence — being a blind alley, or *cul de sac*, and not a thoroughfare—in such sort a public place, or highway, that an indictment will lie for its obstruction?

Before reaching this question, it must be decided whether or not the evidence submitted to the jury was properly admitted, and could legally establish any sort of an alley.

This being admitted, we say the verdict must stand, unless such an alley as is alleged in the information, and as the jury have found to exist, can not, in the law, be, when there is no thoroughfare.

So it was formerly said, *obiter*, in England, by Abbott and Mansfield, JJ., doubting Lord Kenyon's holding to the contrary. — *Rosc. Cr. Evid.*, 564, *cas. cited*; 1 *Russ.* 332, *cas. cited.*

But the ruling of the latter in the leading case of *Rugby. Charity v. Merryweather* (11 *East*, 375) has been sustained in a late case (1852) in the Q. B. (*Bateman v. Bluck*, 14 *E. L. & Eq.* 69), where the very question directed to be argued was raised.

This case is considered by Mr. Angell (Highways, pp. 108—110), as settling the point. — See also *Gwyn v. Hardwicke* 36 *Eq. L. & Eq.* 546; *Hand, J.* 11 *Barb.* 462, *Cr.* 464; 2 *Bish. Cr. Law*, §§ 1046, 1048; *Redfield, C. J.*, 22 *Vt.* 317.

It is certainly true that this alley is *absolutely free and open to any person who chooses to pass along it*, and it seems to us that this is the test. This alley, in the rear of a hotel, is more frequented than many *streets* in the outskirts of the city.

2. The same provisions are made for making, paving and clearing the alleys, which are made in regard to streets, among the duties prescribed to the overseers of

highways, &c., by the present, and the late charter of the city. To be sure, alleys are now opened at private expense, but *streets* were, also, under the late charter.

3. But if not a highway, the *locus in quo* is a *public space*, dedicated on the plan of 1807, which can no more be obstructed than the public squares like the Campus Martius.

*Holbrook & Bishop, and G. V. N. Lothrop,* for defendant.

1. Unless it is a public highway, it is clear that no indictment lies for its obstruction. The injury which would be done is not a *public* but only a *private* one, and a private action must be brought for a private injury. This is so well settled that it is applied to what are called *town-ways* in New England—a way laid out not for the whole public, but only for the inhabitants of the particular town or municipality.—1 *Bish. Cr.* § 353 ; *Thorner's Case,* 1 *Vent.* 208 ; *Commonwealth v. Low,* 3 *Pick.* 408 ; *Drake v. Rogers,* 3 *Hill,* 604 ; *State v. Randall,* 1 *Strobh.* 110 ; *State v. Strong,* 12 *Shep.* 297 ; 6 *Shep.* 66.

It is true that an indictment was resorted to for an obstruction of a private way in 10 *Humph.* 119 ; but the point was not taken in the case.

A public highway is one open for all citizens to pass and repass thereon. It is a *thoroughfare.* The *mode* of passage is nothing.— *Angell on Highw.* 3, *and cases cited; Webster's Dic. "Thoroughfare;"* 3 *Kent.* 432 ; 2 *Bouv. L. Dic.* 587, *"Cul de Sac;"* 1 *Ibid.* 357.

Where, however, a way is only for the use of particular individuals, or of a limited description of persons, it is a private way. — 2 *Bl. Com.* 35 ; *Drake v. Rogers,* 3 *Hill* 606.

Now, looking to this passage, it is obviously not a thoroughfare, and was not so intended. We may aid our judgment by looking to the whole plan. Here are streets traversing the whole city, and so connecting with each

other or other thoroughfares as to indicate that they are public thoroughfares. These have no restricted relations to blocks or other sub-divisions of land. On the other hand it is equally obvious that the narrower spaces known as alleys are not intended for any such general public use. They have a restricted relation to blocks. Their use evidently relates to the adjacent lots. They obviously appertain to the lots which abut on them; and it is clear that but for the uses and necessities of these particular lots, these alleys would have no existence. These remarks apply to alleys generally which merely intersect blocks of lots.

But the alley in question is peculiar. It was not only not designed for a thoroughfare, but is not susceptible of such use. No one can go through it. No one can have occasion to go into it for general business, but only for special business connected with some adjacent lot. No one can come out except on like business. Necessarily, therefore, its use is private. — See 23 *Barb.* 103.

These facts, therefore, fully repel all presumption that this passage was ever dedicated as a public highway.

We do not say that a space or passage closed at one end *may not be* a public highway. It is not necessary to go so far. There are such spaces in cities sometimes called "courts," "places," and "squares," which may be to all substantial intents highways.

But where a passage is like this, wholly in the interior of a block, and its design obviously for the accommodation of the lots of that block alone, and all its uses necessarily restricted to the lots abutting on it, it repels all idea of a dedication to public uses, and of course all idea of a dedication as a public highway. The natural and necessary inference is that it was designed, for what it admirably secures, a private easement. — See *Austin's Case,* Vent. 189; *Woodyear v. Hadden,* 5 *Taunt.* 126; *Wood v. Veal,* 5 *B. & Ald.* 454; 2 *Bish. Cr. Law.* § 1048.

And this seems to correspond to the view taken of

alleys in the city charter. — *Chap.* 7 §§ 11 *and* 12; *Chap.* 5, § 21 *Sub.* 11; *Laws* 1857, *pp.* 96, 122.

CHRISTIANCY J.:

Is the obstruction of the alley in question a wrong of such a public nature as may be redressed by indictment, as a criminal offense at common law? This is a preliminary question, and must be disposed of before we can reach any of the questions raised by the bill of exceptions. This information simply takes the place of an indictment, and must stand or fall by the same rules.

To make an obstruction like this an indictable offense, it must injuriously affect some public right — some right in which the public, in their aggregate capacity, have a common interest, as distinguished from a mere individual or private right. If it affect only the rights of an individual, or of a definite number of persons less than the whole, in their individual capacity, the several persons actually injured have their remedy by private action; but no indictment lies. — 4 *Blk. Com.* 5; 1 *Bish. Cr. L.* §348. Of course it is not necessary, in order to maintain an indictment, that all should be actually injured; but the tendency of the act must be to affect injuriously a right which all are entitled to exercise if they see fit.

The difference between these two classes of rights is easily comprehended in the abstract, and in most of the cases actually arising; but in the almost infinite variety of cases which call for the distinction, these two classes of rights will be found to approach each other by such insensible gradations, and to be sometimes so intimately blended, that it will be found, in some cases, extremely difficult to decide which predominates and gives character to the particular case. All can readily distinguish the primary colors in the rainbow; none, the precise line which divides them.

Where public and private rights so nearly approach

each other, individual cases only can serve to illustrate the distinction; and each case must be decided upon its own peculiarities.—See *Rex v. Turner*, 13 *East*, 228; *Rex. v. Richards*, 8 *T. R.* 634, 726; *State v. Baldwin*, 1 *Dev. & Bat.* 195; *Rex v. Medley*, 6 *C. & P.* 292; *Commonwealth v. Haynes*, 2 *Gray*, 72, 74. See also *Commonwealth v. Webb*, 6 *Rand.* 726, which well illustrates the distinction, though it may be doubted whether it was properly applied in that case, where the wrong was one affecting the health, and consequently might be said to endanger the lives, of persons.

This information shows no right of the public at large affected by this obstruction, unless the place obstructed is shown to be a public way, or a highway; for the right of " *using*," the " alley " for any other purpose than that of passage or travel by the public generally, can not be recognized as a common public right, without some averment showing the special nature of the use to which the public are entitled. Had the place been alleged to be " a public square " in the city, this might, perhaps, have suggested some definite idea of some other public use besides that of passage or travel. But if the terms "public alley" could, *ex vi termini*, import a public right of passage, they certainly do not necessarily import any other species of public right; and if any other existed it should have been averred.

Was, then, the alley in question, at the place of the obstruction, a public way, or highway? To constitute such highway it must be one over which all the people of the state have a common and an equal right to travel, and which they have a common, or at least a general, interest to keep unobstructed. This principle is so familiar as hardly to need the citation of authorities. See however *Roscoe's Cr. Ev.* 562 *to* 566; 1 *Russell on Cr.* 320; 1 *Bishop Cr. L.* § 353.

If it be a way the obstruction of which can prejudice

only the rights of the owners or occupants of adjoining lots, they have their remedy by private action; if it affect only the rights of the inhabitants of the city, or the rights of the city in its corporate capacity, it may be a proper subject for the local police of the city, to be regulated by ordinances and by-laws. But in neither case would it be a proper subject for an indictment.

This information does not allege the alley to be a public way, or highway; this would have shown the public interest, and the public right injured by the obstruction. But the terms "public alley," have not, like "highway," any fixed and definite legal meaning. It is, therefore, very questionable, at least, whether the information upon its face sets forth any criminal charge. — See *Commonwealth v. Webb*, 6 *Rand.* 726.

But, I do not propose to consider the case upon this narrow ground. We have before us, with the information, all the evidence in the case, and the plat or plan of the city as laid out by the Governor and Judges.

I shall, therefore, give to the prosecution the benefit of the assumption that the information sufficiently describes the place as a highway; that the alley was originally laid down as shown by the plat; that it has never been altered by any public authority; and that the dedication of the alley as shown by the plat, has been accepted in accordance with its original design.

Looking to the map or plan of the city, we discover numerous open spaces designated as streets, connecting with, and intersecting each other through the whole plan, obviously intended, not for the particular accommodation of any particular lot or lots only, but as common streets or thoroughfares for general public passage and travel. These streets divide the area of the city into a great number of sections or blocks, of various shapes and sizes, generally again subdivided into lots, designated by numbers, and fronting on these streets. Through some of these sections or blocks,

we find other narrower open spaces, evidently designed for alleys, furnishing a means of access to the rear of the lots. In some of the blocks these alleys do not pass through from street to street, but stop short in the middle of the block; forming no connection from one street to another. Section eight, in which the alley now in question is situated, is nearly square, and bounded by streets on each of its four sides, and containing eight lots, each fronting on a public street, and the four corner lots each bounding on two streets. From the street on the east, the alley runs in west to the centre of the section; at this point it meets an alley coming in from the street on the north, which alley, from this point of junction, deflects to the south-west just the width of the alley, and then continues south fifty feet to the line of lot one, where it stops without communicating with any street, alley or passage whatever. This extension of the last named alley, from the point of junction above mentioned, thus forming a *cul de sac* of twenty feet in width by fifty in length, in the interior of the block, and, of course, in the rear of the adjoining, lots, and opening only into the alley at the junction already mentioned.

It is for an obstruction in this recess, or *cul de sac* only, and not in any part of an alley forming a passage from one street to another, that this prosecution is brought.

Now, looking at the plat, and the uses for which alleys are usually designed, it is difficult to believe that even those alleys which pass through a block or section, forming a continuous passage from one street to another, were ever designed or intended as highways, for the purpose of ordinary travel by the public at large. But they would seem to have been intended especially for the convenience of the particular lots in the rear of which they run, and as a means of access to the rear of such lots, for purposes not so conveniently attained from the streets in front; and therefore, as an easement appurtenant to the adjoining lots. As such, the owners and occupants of all

the adjoining lots would, doubtless, be entitled to use them in common, each for purposes connected with his own lot; no one having the right, as against another, to close or unduly obstruct such alley. Besides these individual rights, the city, in its corporate capacity, may, perhaps, under its charter and ordinances, for the purposes of regulation and police, possess certain rights and powers in or over the alleys, and it may be, also, the right to open them, and even to prohibit their being obstructed or closed. But it is difficult to see what public right or interest of the state at large would be prejudiced by closing or obstructing such alley; unless, indeed, by actual user as such by the public, it might have become a highway or channel of public travel. But in the absence of proof of such user for a sufficient length of time, I am strongly inclined to the opinion that they can not be treated as highways for any purpose. But upon this I give no definite opinion, as the present case does not call for it; since this alley, at the place of the obstruction complained of, is entirely incapable of forming a passage-way from one street to another, and was evidently designed *only* for uses peculiarly connected with the rear of the adjoining lots. Nor, in the nature of things, is it susceptible of becoming a thoroughfare by actual use. But, it is said, it may be a highway without being a thoroughfare (that is, without passing through from one street or highway to another). That a street or way may be a highway without being a thoroughfare (that is, without connecting with a highway at both ends, or at either end), I am not disposed to deny; as, for instance, a street running across a city from side to side, and terminating at the city line at each end, without connecting there with any other street or highway, but intersected at various points in its course by other public streets; the portion at each end beyond where it is intersected by any other streets, though forming a *cul de sac*, if dedicated or laid out by the public authorities for the pur-

pose of a street, actually opened, used and traveled as a
street, with dwellings fronting on both sides, or either side,
would, I think, be as much a highway as any other part of
the same or any other street. It would not only form the
ordinary means of access to the houses along such part of
the street for the particular inhabitants, and for all others
who might wish to call upon any of the inhabitants for any
matter of business, but the people at large would have the
right to travel, ride, or walk there, for pleasure or amuse-
ment. The same considerations will apply equally to roads in
the interior of the state. And in a new, unsettled country,
just beginning to be penetrated by public roads, the con-
sequences would be serious in the extreme, if no road
could be treated as a highway beyond where it is inter-
sected by others. I am, therefore, compelled to doubt the
correctness of the decision of the Supreme Court of New
York, in *Holden v. Trustees of Cold Spring*, 23 *Barb.* 103.
*See* 2 *Bish. Cr. Law*, § 1048; *Angell on Highways*, § 137.

But the case before us is very different. The *cul de sac*,
or part of an alley, here in question, was never intended
to be dedicated as a highway, was never laid out as such
by the public authorities, never opened or worked as
such; nor does it appear that any dwelling was ever
erected adjoining it, to which it served as means of ac-
cess; and if it were possible to become a highway by
user, there was no evidence from which the jury could
have found such user, had the question been left to them.
But they were expressly instructed that no user was ne-
cessary, even to make it a public alley — the court, it
would seem, considering a public alley in the light of a
public highway. This case, therefore, is not supported by
that of the *Trustees of the Rugby Charity v. Merry-
weather*, 11 *East*, 375, *note*, nor by that of *Bateman v.
Bluck*, 14 *Eng. L. & E.* 69, upon which the counsel for
the prosecution mainly relies. The first (11 *East*, 375, *note*,)
was an action of trespass for removing an obstruction in

a *common street*, which, however, was not a thoroughfare, by reason of the houses at the end. Lord Kenyon said, "As to its not being a thoroughfare, that can make no difference;" and, upon principle, I think he was right, notwithstanding what is intimated to the contrary in *Woodyear v. Hadden*, 5 *Taunt.* 125, and in *Wood v. Veal*, 5 *B. & Ald.* 454. In the case of *Bateman v. Bluck*, the *locus in quo* was a passage leading from the public street up to a court, called Hat and Mitre Court, which consisted of fourteen or fifteen houses, belonging to the plaintiff. The passage had always been lighted by the public authorities of the parish, and had been paved by the authorities at the request of the plaintiff. There was evidence of user as a highway; and the jury had found it to be such. The only question for the court was, whether, as a legal possibility, there could be a highway where there was no thoroughfare; and the court held, very properly, I think, that there might be.

It is. easy to see that a way, or *cul de sac*, which forms the usual route of travel, or means of access, to the fronts of a number of dwellings, stands upon a very different ground, in respect to the question of user as a highway, from one which leads only to the rear of lots fronting on public streets. The former constitutes the ordinary means of passage between these dwellings and the world at large; not only for the occupants, but for all others who may wish to call upon them for any purpose, or all purposes generally; while the latter can only be used as a passage for purposes connected with the lots themselves. In the first case, the use is for general purposes, and may, therefore, be a public convenience; in the latter, its use is directly connected with the use of the lots, and essentially appurtenant to them, and therefore of merely private convenience; and if all the adjoining owners see fit to close it, it is not easy to see how the public at large can be injured. If one, or a part, of the adjoin-

THE PEOPLE *v.* JACKSON.

ing owners, close it without the consent of another, that other, in a proper case, has his individual redress by suit.

Whether, therefore, we look to the information and the evidence together, or to either alone, we can see no ground for holding the place in question a highway. No public prosecution, therefore, can be supported for the obstruction complained of. This conclusion disposes of the case.

The verdict should be set aside, and the information dismissed. Let it be so certified to the Recorder's Court.

The other Justices concurred.